ALBERT G. THORNTON *versus* NATHAN D. APPLETON & *al.*
*Administrators.*

A contract may be avoided by proof of defendant's insanity at the time of contracting.

For such purpose, the proof may be offered by the defendant himself.

If one, without consent of the maker, affix his name, as subscribing witness to a note which had been executed without attestation, it is a material alteration of the note. — Per HOWARD, J.

But such alteration will not vitiate the note, if done without intention to defraud.— Per HOWARD, J.

HOWARD, J. — This suit is founded upon two promissory notes, signed by Sarah Thornton, the intestate, and payable to the plaintiff. One given August 14, 1835, for $620; and the other dated August 2, 1843, for $1825, and purporting to be witnessed by G. Perkins. The defence applies, exclusively, to the note last mentioned. The case was withdrawn from the jury, and submitted to the Court, upon a report of the evidence at the trial to determine the law and the facts.

It is contended that this note has been materially altered since its execution, and that it is, on that account, void.

The attesting witness, Perkins, being called by the plaintiff, testified that he saw the intestate sign the note ; that the plaintiff requested him to go to the house of the intestate, and that when there, the plaintiff said, " I (the witness) would see the signature of the note ; she said very well, or something to that amount." The witness testified further, that he did not sign as a witness that day, but that he did so afterwards, in March, 1844, by request of the plaintiff, but without any request from the deceased.

Procuring a person to sign a promissory note, as an attesting witness, without the consent of the maker, and after it has been executed without attestation, is effecting a material alteration in the instrument. But this does not annul the note, if the alteration were made without an intention to defraud. In this instance, the attesting witness was present, and by request, saw the maker sign the instrument, and could then have perfected the attestation with legal propriety; and his completing afterwards, what he might have done, legally and properly, at the date, does not, in the absence of all other evidence, furnish proof of fraud. The act may have been consistent with honesty on the part of the witness, and the payee, although nugatory and inoperative. For such alteration, under such circumstances, the note cannot be avoided. *Smith* v. *Dunham*, 8 Pick. 246; *Adams* v. *Frye*, 3 Metc. 103; *Willard* v. *Clarke*, 7 Metc. 435; *Rollins* v. *Bartlett & al.* 20 Maine, 319; *Eddy* v. *Bond & als.* 19 Maine, 461.

The insanity of a contracting party may be shown by himself, in avoidance of his contract. Formerly this rule of law, so consistent with humanity, and natural justice, was doubted and denied; and was made to yield to a misconceived maxim of the common law, that " a man shall not stultify himself." But it is a relief to know that the claim, which has been asserted for the common law, as being the perfection of human reason, whether just or not, cannot be impaired by this ingrafted maxim, so justly condemned, as mischievous and absurd, in its general application. Fitz, N. B. 202, (466, 467;) *Gates* v. *Boen*, 2 Str. 1104; 2 Black. Comm. 291; Just. Inst. Lib. 3, Tit. 20, § 8; 1 Fonbl. Eq. B. 1, c. 2, § 1; 2 Evans' Poth. on Oblig. App. No. 3, p. 25; 2 Kent's Comm. 451; 1 Story's Eq. Jurisp. § 225; 1 Chit. Pl. 470; *Mitchell* v. *Kingman*, 5 Pick. 431; *Seaver* v. *Phelps*, 11 Pick. 304; *Hix* v. *Whitmore*, 4 Metc. 545; *Rice* v. *Peet*, 15 Johns. 503; 2 Greenl. Ev. § 369, 370.

In questions involving the sanity of a party to a contract, these general principles have a dominant application to the inquiry. Sanity is to be presumed, until the contrary is

proved. General mental derangement being established, the party alleging sanity must prove it; and monomania, or derangement of a single faculty of the mind, or in reference to particular subjects, should, with regard to that faculty, and to those subjects, be submitted to the same rules, and attended with the same consequences, as general mental derangement. But if the insanity be temporary, or accidental, it forms an exception to these general rules, so far as to vary, or relax their application. 1 Greenl. Ev. § 42; 2 Greenl. Ev. 371; 2 Poth. on Obligations, by Evans, App. 24; 2 Madd. Ch. Prac. 756; 2 Co. Litt. 246, B, note 185; 3 Stark. Ev. 1283; *Attorney General* v. *Parnther,* Bro. Chan. 443.

· It appears by the evidence reported, that there was a manifest change in the intestate, about ten years before her decease, and that she then " became more beside herself, in matters of business," showing marked indications of insanity, on particular subjects. She had previously closed the administration on a large estate of her husband. About twenty years since, she had advanced to four or five of her elder children, (the plaintiff being one of the younger children and not included,) between two and three thousand dollars each. She died in 1845, at the age of seventy years.

The deceased pretended to be poor, although the evidence in the case shows, that she possessed property worth $20,000 or $30,000, after a loss of $20,000 in 1829. She claimed to own the whole of Cutt's island, in Saco, formerly the property of her father and of great value; also a large portion of Boston; the city of Washington; Louisiana, on account of the French claims; the whole world, and " the cattle upon a thousand hills." She preferred large claims against some of her own family, and complained that some of her children had cheated her out of large sums; all, apparently without foundation. She frequently sought to recover these claims by suits at law, but counsel, to whom she resorted for legal advice, declined to prosecute them. " She would run from one office to another, upon the idea that she had lost every thing, and wished suits to recover it." " She was a great lover of money, miserly, and liked to lay it up," as stated by the witness.

Thornton *v.* Appleton.

The deceased claimed a right to the advancements she had made many years before, to her elder children, and insisted upon a repayment, as that would bring the millenium. There does not appear to have been any foundation for her claim to repayment; but she insisted these advancements were cheating her other children, including the plaintiff, out of the same property. Long after the estate of her husband had been settled by administration, she went to the Judge of Probate, and wanted to administer, and to show that the estate was not settled right, by the 58th Psalm.

In January, 1839, the deceased wrote to the Representative in the Legislature, from Saco, and this letter was produced in evidence. It contains a caution to the Legislature against the Governor, as a dishonest man, and as being indebted to her $4000, and as having been chosen by the people, and not by God. She then complains of Congress, for not paying the French claims, amounting to $16,000,000 ; states that we want a king to go and take Louisiana, to pay the debt, and that the millenium was, for all men to be honest, and pay their debts. After this the deceased grew worse, as the witness expressed it.

She pretended to be the daughter of Abraham and Sarah ; the Virgin Mary ; the Messiah, and afterwards, the Living God.

The testimony shows that the deceased managed her own domestic affairs, and her private business, with, perhaps, something less than ordinary skill. She leased property and collected rents ; paid her taxes, and received her dividends at the banks, generally herself, but at times was aided by her sons. She made purchases at the stores, suitable for her condition.

Some of the witnesses speak of the *insane seasons* of the deceased, while others testify to her insanity, and delusions, upon the particular subjects referred to, as if permanent, and not temporary. One of the latter, and a connection of the family, and intimate with the deceased, testifies that he saw her every day. In transacting business, she would generally exhibit no indications of her delusions, until she had finished the

particular business of the time ; and after that, in the language of the witness, " she would get on her insanity track."

The evidence conclusively establishes the fact, that the deceased was insane, for several years before giving the note in question, and afterwards, until her death, upon the subjects of *religion, her property and claims,* and the *advancements to her elder children.*

From this state of mental disease of the deceased, there does not appear to have been any restoration. No lucid interval was proved, in which she correctly recognized her true condition, and when her delusions had disappeared, and her faculties and affections had returned to their natural channels.

Being insane upon these subjects, the deceased was not competent to dispose of her property by contract, or conveyance. Although the note in question, was, in form, a legal contract, yet it was made after these peculiar delusions had paralyzed the intellect and the affections ; and when the power to contract was in abeyance ; and it may therefore, be avoided upon legal principles.

Judgment for the plaintiff, for the amount of the note of August 14, 1835, not disputed, deducting the indorsements and the set-off, as filed and admitted.